## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

IRA E. WILLIAMS,                           :

      Plaintiff,                      :
                                       Case No. 3:12cv00265
 vs.                                      :
                                   District Judge Walter Herbert Rice
CAROLYN W. COLVIN,                          :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                    :

      Defendant.                      :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.  Introduction

    Plaintiff Ira Williams brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

    This judicial appeal concerns Plaintiff's second set of applications for disability benefits.  Plaintiff initially filed for DIB and SSI alleging a disability onset date of December 12, 2003.  (*PageID#* 139).  When Plaintiff's initial application and request for reconsideration were denied, he requested a *de novo* hearing before an administrative law judge ("ALJ").  After an evidentiary hearing held on October 25, 2006, ALJ Thomas R.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

McNichols II denied Plaintiff's application in a written decision dated June 22, 2007.

(*PageID##* 139-52). ALJ McNichols specifically found that Plaintiff retained the residual

functional capacity ("RFC") for light work, except that:

> [H]e cannot climb ropes, ladders or scaffolds; he cannot tolerate exposure to
> hazards or extremes of temperature or humidity; he cannot have direct
> dealing with the public; he should not be required to maintain concentration
> on a single task for longer than 15 minutes at a time; he should not work as
> part of a team; and he is limited to low stress jobs. Low stress is defined as
> jobs that do not involve production quotas or over the shoulder supervision.

(*PageID#* 146). There is no record of further appeal of ALJ McNichols' decision.

Instead, in December 2007, Plaintiff filed new applications for DIB and SSI,

alleging the same disability onset date of December 12, 2003, and claiming he was

disabled due to seizures, tremors, chronic pain, headaches, depression, and a heart

condition. (*PageID#* 272). After Plaintiff's claims were again denied initially and upon

reconsideration, he again requested a *de novo* hearing before an ALJ, which was held on

August 17, 2010. (*PageID##* 102-37).

On August 27, 2010, ALJ McNichols again denied Plaintiff's applications based

on his conclusion that Plaintiff's impairments did not constitute a "disability" within the

meaning of the Social Security Act. (*PageID##* 82-95). The ALJ's nondisability

determination and the resulting denial of benefits later became the final decision of the

Social Security Administration when the Appeals Council denied Plaintiff's request for

further review. (*PageID##* 57-61).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record (Doc. #7), and the record as a whole.

## II.   Background

### A.   Plaintiff's Vocational Profile and Testimony

Plaintiff was 36 years old on his alleged disability onset date, which defined him as a "younger individual" for purposes of resolving his DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[2]; (*PageID#* 93).  Plaintiff is single, does not have any dependent children, and lives with his mother.  (*PageID#* 106).  Plaintiff has a driver's license, is able to drive, and testified he drives "usually every other day."  (*Id.*).  Plaintiff graduated from high school, and testified he has vocational training in electronics. (*PageID#* 107).  Plaintiff used to build electronic components until the alleged disability onset date of December 12, 2003.  (*PageID#* 108).

Plaintiff stated he quit his job after "[m]y boss and I had talked it over and decided it'd be best because he was afraid that – at the time, I was having, I guess, like blackouts too, you would call them.  And then working with electronics and then around machinery, we had to work around the drill press and a lathe – he was afraid that I was going to have an accident of some sort."  (*Id.*).  Plaintiff testified he still has blackout spells "from time to time," and that "it seems like maybe they're [occurring] maybe three or four times a

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

year." (*PageID#* 109).  Plaintiff stated he has been told he loses consciousness during the

blackouts, and does not know what causes them.  (*Id.*).  Plaintiff does not take any

medication for the blackouts.  (*PageID#* 110).

Plaintiff also testified he suffers from some tremors and shaking in his hands, that

could happen a number of times a day.  (*Id.*).  On a typical day, he stated he has these

hand tremors and shaking "probably six or seven times," and that they last "from seconds

to . . . as long as an hour."  (*PageID#* 111).  Plaintiff does not know what causes these

tremors, but takes medication for them.  (*Id.*).  He further testified that he has heart

problems.  (*PageID#* 112).  Specifically, Plaintiff stated he has coronary artery spasms,

and a valve that is "not working right."  (*Id.*).  He stated his doctor told him "the left

bottom side of [his] heart is thickened and stiffened to what he would see in someone in

their late 60s, early 70s."  (*Id.*).  He claims his heart problems cause him shortness of

breath and heart palpitations, which "happen on and off throughout the day, usually

sometimes several times, sometimes two or three times a day."  (*PageID#* 112).  He also

stated he experiences chest pain and takes nitroglycerin for it.  (*PageID#* 112-13).

As to psychological or emotional problems, he testified he has been diagnosed

with depression and anxiety that affects him everyday.  (*Id.*).  He sees a psychiatrist for

his medications every two to three months, and sees a therapist between once a week to

once every two weeks, depending on how he feels.  He has been doing this since 2004.

(*PageID#* 114).  He stated he sees his cardiologist and neurologist about every three to

four months.  (*PageID#* 115).  He stated he does not notice any side effects from

medications.  (*PageID*# 116).  Plaintiff testified he has pain in his hands that has "come on probably about the last year and a half, not quite two years maybe."  (*PageID*# 117).  On a scale of zero to ten, where ten is the worst, Plaintiff rated pain "on a typical day usually about a five, five and a half; and when it hits with its force, usually about an eight and a half, nine."  (*PageID*# 117).  When the pain hits, Plaintiff stated "it's hard for me to make any kind of a fist.  It's hard for me to get my fingers bent to hold anything."  (*PageID*# 118).  Medications help "keep[] the pain subdued some, but not all the way."  (*Id.*).

When asked by the ALJ if any of his conditions are getting any better, any worse, or staying about the same, Plaintiff responded that he believes his breathing, heart problems, depression, and "dealing with things," have all worsened.  (*PageID*# 119).  Plaintiff testified he can only walk about a block before his shortness of breath and heart pain will cause him to need to stop.  (*PageID*# 120).  He testified he can only sit in a chair between an hour to an hour and a half before he needs to stand up.  (*PageID*# 121).  Plaintiff stated he can only lift about two bags with groceries before he is out of breath, (*PageID*# 121), and also suffers from short-term memory problems.  (*PageID*# 127).  He does not believe he could safely perform any kind of work he performed before.  (*PageID*# 122).  Plaintiff is able to use the microwave, wash dishes, sweep, mop, vacuum, do laundry, and go grocery shopping.  (*PageID*# 123).  He likes to read, and stated he does not drink alcohol, smoke, or use drugs.  (*PageID*# 124).

On a typical day, Plaintiff testified that he will wake up around 8:30 or 9:00 a.m.; sit for "a little bit" and watch television; take a nap in the afternoon; eat dinner; and watch more television.  (*PageID#* 126).

### B.  <u>Relevant Medical Opinions</u>[3]

The record contains a copy of Plaintiff's voluminous treatment notes from TCN Behavioral Health Services dated from December 18, 2003, through November 11, 2009. (*PageID##* 326-507, 589-779, 845-77, 888-944).  When initially assessed, Plaintiff reported a history of depression going back to his childhood.  (*PageID#* 485).  The clinical nurse specialist in psychiatry, Cynthia Van Ausdal, RN, MSN, CNS, diagnosed Plaintiff with major depressive disorder, recurrent and assigned him a Global Assessment of Functioning ("GAF") score of 60[4].  (*PageID#* 493).

On February 3, 2004, Plaintiff's affect was constricted and his mood was anxious and depressed. His short term memory was decreased. (*PageID#* 483) His diagnosis remained major depression, recurrent and moderate and his GAF was 55. Progress notes

---

[3]The record contains a number of medical reports and correspondence from physicians who treated Plaintiff for physical ailments not at issue in this case, which are therefore not addressed herein.

[4]"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Comm'r of Soc. Sec.*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34. Individuals with scores of 51-60 are classified as having "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  (*Id.*).

show that Plaintiff began seeing a therapist multiple times weekly but his therapy sessions were reduced from two times per month, and he sees the psychiatrist every three months.

He complained of being dysphoric, angry, and anxious; felt hopeless; heard voices; had low energy; had racing thoughts; had blocked thought processes; and his hygiene was poor. Mental status examinations at various times showed he had a constricted or flat affect, depressed or anxious mood, disheveled appearance/poor hygiene, suicidal ideation, auditory hallucinations, poor cognition, psychomotor retardation, and poor insight and judgment. He was prescribed Wellbutrin, Paxil CR (*PageID#* 484) and Seroquel was added to his medications. (*PageID#* 468-69).

Plaintiff was again assessed on June 20, 2005. (*PageID##* 377-89). He was diagnosed with major depressive disorder, recurrent and severe without psychotic features and r/o mood disorder with major depressive-like episodes due to neurological condition and assigned a GAF score of 45. (*PageID#* 388). At the time of this evaluation, Plaintiff's treatment consisted of pharmaceutical management, counseling, therapy, and he was assigned a community psychiatric supportive specialist (case worker) to help with resources. (*PageID##* 386, 388).

On April 14, 2008, Plaintiff's mental health therapist, Nathan Wilson, MS, LPCC, reported:

> It is doubtful with the physical and mental health symptoms Mr. Williams is reporting that he would pass an employer required physical exam making it nearly impossible for him to be employed. The symptoms he reports also indicate he would not be able to sustain enough stamina to consistently perform a part-time job; a full-time job is certainly out of the question

with the symptoms he is reporting.

I am hopeful there is a careful review of Mr. Williams' mental health and medical history to establish that he is likely permanently disabled.

(*PageID#* 773).

Plaintiff has received general care from Ronald Pohlman, M.D. since about January 3, 2006. (*PageID#* 884). Over time, Dr. Pohlman has treated Plaintiff for various conditions including black outs, heart problems, dizziness, headaches, memory problems, and fatigue (*PageID#* 515-18); depression (*PageID#* 513-14, 518); and sleep problems. (*PageID#* 516-17). On January 4, 2008, Dr. Pohlman reported to the Bureau of Motor Vehicles that Plaintiff had neurological and psychiatric conditions, but Plaintiff could drive. (*PageID#* 785-86).

Dr. Pohlman completed interrogatories on July 14, 2009. (*PageID#* 878-87). According to Dr. Pohlman, Plaintiff could not perform even sedentary work and would miss work more than three times a month. (*PageID#* 882). Dr. Pohlman listed Plaintiff's conditions as neuromuscular disorder, coronary artery spasms, depression, hyperlipidemia, hypertension, and massive right inguinal hernia. Dr. Pohlman opined that the combination of Plaintiff's mental and physical impairments was greater than the sum of his impairments. (*PageID#* 885). He opined that Plaintiff was unable to work full time owing to a combination of his impairments. (*PageID#* 887).

David Dietz, Ph.D. reviewed the file on behalf of the Ohio Bureau of Disability Determination ("BDD") on February 9, 2008. (*PageID##* 561-33). Dr. Dietz opined that

8

Plaintiff was mildly restricted in his daily activities, and had moderate difficulties in his social functioning and concentration, persistence, or pace. (*PageID#* 571). Dr. Dietz adopted the mental RFC of the June 22, 2007 ALJ's decision (*PageID#* 577). Another state agency psychologist, Alice Chambly, Psy.D. affirmed Dr. Dietz's assessment on June 26, 2008. (*PageID#* 781).

James Gilchrist, Ph.D. evaluated Plaintiff on August 21 and 28, 2008 to determine his current cognitive functioning. (*PageID##* 815-18). Testing results showed Plaintiff scored in the superior range on the WAIS. On the WMS-III, he scored in the low average range on recall of auditory information and auditory recognition memory. He scored in the borderline range on immediate visual memory and recall of visual information. On the CVLT-II, he scored in the low average range on the short-delay free recall task and long-delay free recall task. (*PageID##* 816-17). On the Test of Memory Malingering, the level of performance noted may suggest a possibility of less than adequate performance put forth on this measure. However, this level of performance has been noted in individuals suffering from psychiatric conditions. (*PageID#* 817). Dr. Gilchrist concluded that Plaintiff's most prominent presenting features were that of acute psychiatric symptoms, and that the level of symptoms endorsed by [Plaintiff] most likely explained his reports of cognitive difficulties. In addition, his MMPI-II profile suggested a significant level of clinical depression and related symptoms that are in line with the possibility of a thought disturbance when under particular stress. (*PageID##* 817-18).

      C.    **<u>Vocational Expert Testimony</u>**

In addition to Plaintiff, a vocational expert (VE) testified at the administrative hearing.  The VE classified Plaintiff's past work as a fast food cook and an electronics technician.  The VE classified each position to be in the medium strength range and skilled.  (*PageID#* 131).

The VE was asked to consider a hypothetical individual with the same approximate age, education, and work experience as Plaintiff, who is restricted to light work with the following limitations: no climbing of ropes, ladders, or scaffolds; no crawling; only occasional balancing, crouching, and kneeling; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; no exposure to extremes of hot, cold, or humidity; and no exposure to hazards such as dangerous machinery, unprotected heights, and "things of that nature."  (*PageID#* 132).

With those restrictions, the VE testified there would be light, unskilled jobs still available, including switchbox assembler (approximately 1,000 available in the region), mail clerk (approximately 600 in the region), and packing machine inspector (approximately 1,200 in the region).  The VE testified there would be, cumulatively, approximately 37,000 existing positions which would fit those restrictions.  (*Id.*).

The VE also testified, given the same circumstances, there would be jobs at the sedentary level.  The VE provided some examples, such as rotor assembler (approximately 400 in the region); automatic grinding machine operator (approximately 100 in the region); and food and beverage order clerk (approximately 1,400 in the region).

The VE testified that cumulatively, at the sedentary strength range, there would be approximately 7,100 existing positions that would fit these restrictions.  (*PageID#* 133).

If there was an additional limitation to low-stress work, defined as no production quotas or over-the-shoulder supervision, the VE testified the example of switchbox assembler would be eliminated, and the total number of positions would be reduced from 37,000 to 29,000.  (*PageID#* 133).  As to sedentary positions with the low-stress requirement, the VE testified the position of rotor assembler would be eliminated and the total number of jobs would be reduced from 7,100 to approximately 5,600.  (*PageID#* 133-34).

If another limitation was added requiring no direct dealing with the general public and no teamwork, the VE testified the light, unskilled jobs would be reduced from 29,000 to 21,000, and the sedentary, unskilled jobs, would be reduced from 5,600 to 3,200. (*PageID#* 134).  The VE did not believe Plaintiff could perform any of his past work, and that his skills would not transfer to the light work level.

Plaintiff's counsel asked the VE "[i]f a hypothetical individual were so limited by psychological symptoms that their attention and concentration was impaired to the extent that they would be off task during the workday a third of the time, in your opinion would that individual be able to consistently perform full-time work at any exertional level?" (*PageID#* 135).  The VE responded "no."

Plaintiff's counsel also asked the VE "if an individual, due to their psychological impairments, were unable to maintain attendance and would be expected to be absent

11

three times a month, in your opinion would that individual be able to sustain full-time

work at any exertional level?"  The VE responded "[n]o, not long-term." (*PageID##* 135-

36).

III.    **Administrative Review**

    A.    **"Disability" Defined**

        To be eligible for SSI or DIB a claimant must be under a "disability" within the

definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The

definition of the term "disability" is essentially the same for both DIB and SSI.  *See*

*Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory

meaning, a "disability" includes only physical or mental impairments that are both

"medically determinable" and severe enough to prevent the applicant from (1) performing

his or her past job and (2) engaging in "substantial gainful activity" that is available in the

regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

        A DIB/SSI applicant bears the ultimate burden of establishing that he or she is

under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v.*

*Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v.*

*Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

    B.    **ALJ McNichols' Decision**

        ALJ McNichols resolved Plaintiff's disability claim by using the five-Step

sequential evaluation procedure required by Social Security Regulations.  *See PageID##*

82-95; *see also* 20 C.F.R. § 404.1520(a)(4).  His pertinent findings began at Step 2 of the

sequential evaluation where he concluded that Plaintiff had the following severe impairments: intermittent, infrequent seizure activity; intermittent tremors; intermittent heart palpitation and high blood pressure; depression; and anxiety.  (*PageID#* 84).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*PageID#* 85).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform light work, with the following restrictions: no climbing of ladders, ropes, and scaffolds; only occasional balancing, kneeling, and crouching; no crawling; no exposure to hazards such as unprotected heights or dangerous machinery; no exposure to temperature extremes or humidity; no direct dealing with the general public; low stress jobs with no production quotas and no over-the-shoulder supervision; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; and no jobs involving teamwork.  (*PageID#* 88).

The ALJ concluded at Step 4 that Plaintiff is unable to perform his past relevant work.  (*PageID#* 93).  At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy.  (*PageID##* 94-95).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (*PageID#* 95).

## IV.    __Judicial Review__

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

14

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.  Discussion

### A.  The Parties' Contentions

Plaintiff contends that the ALJ, citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), "erroneously found that based on res judicata, [his] mental condition and RFC had not really changed since the previous . . . decision." (Doc. #8 at *PageID#* 1080).

The Commissioner asserts that the ALJ did not misapply *Drummond* and that he reasonably concluded that Plaintiff's mental condition had not worsened since the previous decision was issued in June 2007. (Doc. #10 at *PageID#* 1095-99).

### B.  *Drummond* and The ALJ's Decision

In *Drummond*, the United States Court of Appeals for the Sixth Circuit held that "the principles of res judicata can be applied against the Commissioner." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997). "When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* (citations omitted). "Absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a pervious ALJ. *Id.* Under *Drummond*, "[t]he burden is on the Commissioner to prove change circumstances and therefore escape the principles of res judicata." *Id.* at 843. To avoid being bound by an earlier decision, the Commissioner

15

must present substantial evidence showing that the claimant's condition has significantly

improved.  *Id.*

After *Drummond*, the Commissioner issued an Acquiescence Ruling mandating

ALJs in Ohio (and other states within the Sixth Circuit) to follow *Drummond* by applying

res judicata to prior assessment of a claimant's RFC and other prior findings made as part

of a sequential evaluation.  The Commissioner explained:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the
> prior claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law . . . .

AR 98-4(6), 1998 SSR LEXIS 5, 1998 WL 283902 (June 1, 1998).

> In the present case, ALJ McNichols wrote:
> The case of *Drummond v. Commissioner of Social Security* 126 F.3d 837 (6th Cir.
> 1997) would apply in the instant application decision.  Accordingly, any evidence
> or records dated prior to the June 22, 2007, decision will be considered reviewed
> and made a part of this decision.  Evidence accumulated after June 22, 2007, will
> be addressed below.

(*PageID#* 82).  As to Dr. Dietz, the ALJ explained:

> Pursuant to the *Drummond* decision, the State Bureau of Disability
> Determination's psychologist, David Dietz Ph.D., after reviewing the medical
> evidence, found the claimant to have moderate difficulty in his ability to maintain
> social functioning and in his ability to maintain concentration, persistence, and
> pace.

(*PageID#* 85).  The ALJ next noted that:

> Pursuant to *Drummond*, the prior residual functional capacity is adopted in its
> entirety.  After reviewing the current medical evidence of record the undersigned

has added the additional limitations of occasional balancing, kneeling, and crouching with no crawling.

(*PageID#* 88).

### C.    Analysis

Plaintiff's first set of applications for DIB and SSI – with an alleged disability onset date of December 12, 2003 – were denied by ALJ McNichols in a written decision dated June 22, 2007.  Plaintiff did not appeal.  Instead, Plaintiff filed a new set of applications in December 2007, alleging the same disability onset date of December 12, 2003.  ALJ McNichols, in a written decision dated August 27, 2010, again denied Plaintiff's applications.

Plaintiff contends that the ALJ's decision that his mental condition had not worsened since 2007 – and thus the previous RFC was again applicable – was not supported by substantial evidence.  (*PageID#* 8, *PageID#* 1082).

Defendant contends the ALJ properly concluded that Plaintiff's "mental health condition has . . . remained longitudinally static since the previous decision of June 2007."  (Doc. #10, *PageID#* 1095) (citing *PageID#* 92).

Upon review, the Court concludes that substantial evidence does not support the Commissioner's decision.  Despite the ALJ's finding that Plaintiff's mental health "remained longitudinally static since the previous decision," (*PageID#* 92), a review of the record suggests otherwise.  For example, in July 2007, Plaintiff's psychiatrist, Dr. Esam Alkhawaga, considered admitting him into the hospital for psychiatric stabilization

due to his increased depression.  (*PageID#* 644).  In October 2007, it was reported that

Plaintiff had "increased sleep problems and fatigue; hygiene is not good and self-care

appears to be lagging."  (*PageID#* 618).  In December 2007, Plaintiff's appearance was

noted as "average, clothes were appropriate," however, it was reported he "had an odor of

urine."  (*PageID#* 606).  In February 2008, his appearance was noted as "disheveled" and

Plaintiff stated "I just don't care about anything."  (*PageID#* 591-92).

On April 14, 2008, Plaintiff's mental health therapist, Nathan Wilson, wrote a

letter addressed "To Whom it May Concern," in which he noted that Plaintiff is being

seen by Dr. Alkhawaga for psychiatric services and him (Mr. Wilson) for outpatient

mental health counseling.  Mr. Wilson stated that "[i]t is doubtful with the physical and

mental health symptoms Mr. Williams is reporting that he would pass an employer

required physical exam making it nearly impossible for him to be employed.  The

symptoms he reports also indicate he would not be able to sustain enough stamina to

consistently perform a part-time job; a full-time job is certainly out of the question with

the symptoms he is reporting."  (*PageID#* 773).  Mr. Williams opined that Plaintiff is

"likely permanently disabled."  (*Id.*).

Subsequently, Dr. James Gilchrist, a psychologist, performed a

Neuropsychological Evaluation on August 21st and 28th, 2008, at the request of

neurologist Antonela Svetic, M.D.  (*PageID##* 815-818).  Regarding Plaintiff's

psychological functioning, Dr. Gilchrist opined:

18

Mr. Williams was administered the MMPI-II to assess current psychological functioning.  The validity configuration indicated that Mr. Williams was endorsing an extraordinary number of psychiatric variables across a range of different clinical diagnoses.  The current level of symptoms is seen in an individual who is typically under severe and acute psychiatric distress.  The profile obtain again reflected elevations not only regarding clinical depression, but also suggests the possibility of a thought disorder when this individual would be under considerable stress.  The clinical configuration does reflect that Mr. Williams' presentation is likely to be related to severe psychiatric symptoms.  The level of symptoms endorsed would clearly impact one's overall cognitive efficiency and result in difficulties with attention and concentration at times.  This individual is likely to feel very distracted.  They are likely to report an increase in forgetfulness.  Again, the level of symptoms endorsed would clearly result in one's perception of a change in cognitive abilities.  The pattern would clearly impact one's overall cognitive efficiency regarding new learning and recall.

(*PageID#* 817).

In interrogatories completed by Plaintiff's family physician, Ronald Pohlman, MD., in July 2009, he reported treating Plaintiff for neuromuscular disorder, coronary artery spasm, depression, hypertension, hyperlipidemia, and massive right inguinal hernia.  Dr. Pohlman concluded that Plaintiff's total functional restrictions resulting from his mental and physical impairments, in combination, is greater than the sum of the parts.  (*PageID#* 885).  He stated that Plaintiff "has multiple conditions that limit his ability to compensate for any single or specific working disability," and that his "depression and mood issues . . . cloud judgment."  (*Id.*).  Dr. Pohlman opined that Plaintiff "is totally disabled from a combination of multiple serious disabilities as described" and is "unable to perform full-time work activity."  (*PageID#* 887).

In September 2009, it was reported that Plaintiff's symptoms "are starting to increase" and he has an "I don't care attitude."  (*PageID#* 891).  It was also noted that

19

"[h]is sleep continues to be sporadic, maybe sleeping for four hours in two days and then will sleep for 19 hours the next day." (*Id.*). Plaintiff's mental health therapist, Nathan Wilson, wrote an e-mail to Dr. Alkhawaga on September 25, 2009, asking to get Plaintiff in earlier than his next scheduled visit due to concerns about his medication not working like it used to and due to "fear" that Plaintiff may start decompensating. (*PageID#* 890). In response, Dr. Alkhawaga indicated for staff to schedule Plaintiff for a visit the next business day, and "overbook" the morning to get him an appointment. (*Id.*). Notes from that visit indicate he appears "not well groomed"; "[d]epression is getting worse"; and that Plaintiff reported "a sense of helplessness and hopelessness," as well as increased anxiety. (*PageID#* 888).

Nonetheless, despite the above evidence of Plaintiff's worsening mental impairment, the ALJ determined that "claimant's mental health condition has . . . remained longitudinally static since the previous decision of June 2007." (*PageID#* 92). The ALJ also stated that Plaintiff's "mental health records over the past several years reflect consistent treatment with no hospitalizations and certainly suggest stability with regard to the claimant's depression and anxiety given his level of functioning." (*Id.*). These findings are not supported by substantial evidence. In fact, in reaching these conclusions, it appears the ALJ must have either ignored, or overlooked, significant amounts of evidence concerning Plaintiff's mental health condition contained in the record. For example, treatment notes indicate Plaintiff's "[d]epression is getting worse," (*PageID#* 888), and he may be decompensating, (*PageID#* 890), yet the ALJ concluded

20

to the contrary – based on the lack of hospitalizations – that Plaintiff's mental health records "suggest stability with regard to [his] depression and anxiety." (*PageID#* 92). Moreover, while the ALJ relies heavily on the fact Plaintiff was not hospitalized since 2007, he makes no mention of the fact that Plaintiff's depression worsened to the point where his psychiatrist, Dr. Alkhawaga, actually considered admitting him into the hospital for psychiatric stabilization. (*PageID#* 644).

     The ALJ similarly appears to have overlooked or ignored significant portions of Dr. Gilchrist's neurological evaluation. For example, while the ALJ specifically mentioned that Plaintiff scored 121 on IQ testing, he did not similarly discuss results of the MMPI-II – used to assess current psychological functioning – despite the fact Dr. Gilchrist noted that his MMPI-II profile "indicated [Plaintiff] was endorsing an extraordinary number of psychiatric variables across a range of different clinical diagnoses," and that "[t]he current level of symptoms is seen in an individual who is typically under severe and acute psychiatric distress." (*PageID#* 817). Moreover, the ALJ ultimately gave significant weight to the "well-supported conclusions of the BDD reviewing psychologists, Dr. Dietz and Dr. Chambly," (*PageID#* 92), yet their opinions were all rendered prior to the completion of Dr. Gilchrist's evaluation and thus never considered this evaluation, nor subsequent evidence of Plaintiff's worsening mental state. In fact, as Plaintiff notes, these physicians "at the most . . . only reviewed four exhibits. (PageID 158, 162, 177, 181)." (Doc. #8 at *PageID#* 1083).

The ALJ's decision to reject the opinion of Plaintiff's mental health therapist, Nathan Wilson, is also not supported by substantial evidence.  Although the Regulations do not define mental health counselors as "acceptable medical sources," the opinions of such individuals are not automatically discarded.  Rather, "opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6ᵗʰ Cir. 2007) (discussing in part Social Security Ruling 06-03p, 2006 SSR LEXIS 5, 2006 WL 2329939).

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Cruse*, 502 F.3d at 541 (quoting Soc. Sec. Ruling 06-03p, 2006 SSR LEXIS 5 at *15-*16, 2006 WL 2329939 at *7).  The ALJ relied upon the fact that Mr. Wilson was not an acceptable medical source, as well as his finding that the "record reflects there was no objective testing of the claimant."  (*PageID#* 86).  Despite Defendant's contentions otherwise, the ALJ did not provide good reasons for discounting this opinion.  The ALJ overlooked the fact that treatment notes from TCN Behavioral Health Services, and Mr. Wilson, identified many symptoms indicative of mental illness, including depression, anxiety, anger, and difficulty sleeping.  (*See PageID##* 589, 592, 596, 599, 602, 604, 606,

608, 771, 774, 776, 779, 847, 850, 852, 856, 859, 862, 865, 867, 869, 888, 892, 895, 897, 903, 905, 907, 910, 912, 916, 933-35, 937, 943). When mental work abilities are at issue, such symptoms constitute supporting medical or objective evidence. As the United States Court of Appeals for the Sixth Circuit has explained:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices . . . in order to obtain objective clinical manifestations of mental illness . . .
>
> [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)(citations omitted). Thus, the ALJ's rejection of Plaintiff's therapist's opinion is not supported by substantial evidence.

Many of the ALJ's other findings are also unsupported by the evidence of record. For example, the ALJ stated that Plaintiff can "groom and dress himself," yet treatment notes indicate otherwise. For example, in October 2007, it was reported that Plaintiff's "hygiene is not good and self-care appears to be lagging." (*PageID#* 618). In December 2007, it was reported Plaintiff "had an odor of urine." (*PageID#* 606). In December 2007, it was noted by an interviewer with the Social Security Administration that Plaintiff "had terrible body odor." (*PageID#* 269). In February 2008, he was noted as appearing "disheveled." (*PageID#* 591-92). In September 2009, it was noted he showers "once a week" and only changes clothes two or three times a week. (*PageID#* 931).

As to Plaintiff's tremors, the cause of which remains largely unidentified, the ALJ also incorrectly noted that "there is no record of the claimant experiencing tremors in the presence of another person. . . ." (*PageID#* 93).  Yet the Social Security Administration's interviewer, in fact, made the following personal observations regarding Plaintiff after meeting with him in December 2007:

> He was accompanied by his case worker. . . On several occasions he would have awkward body movements - the case worker called them ticks.  He would be delayed in responding until he could talk again.  It was almost like he was frozen in place.  Very obvious he was having some type of tic or seizure.

(*PageID#* 269).

For all of the above reasons, the Court finds the ALJ's decision is not supported by substantial evidence, and accordingly, Plaintiff's Statement of Errors is well taken.

## VI.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

24

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems previously identified.  On remand the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-Step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for SSI and DIB should be granted.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Ira E. Williams was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations; and

4. The case be terminated on the docket of this Court.

July 25, 2013

s/Sharon L. Ovington
Sharon L. Ovington
Chief United States Magistrate Judge

25

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474